Richard B. SMITH, Plaintiff-Appellee,

v.

Sheriff Mike SULLIVAN et al.,
Defendants-Appellants.

Hector Salvida AMAYA,
Plaintiff-Appellee,

v.

Sheriff Mike SULLIVAN et al.,
Defendants-Appellants.

No. 77–3407.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1980.

George N. Rodriguez, Jr., County Atty., Michael Patrick Davis, Asst. County Atty., El Paso, Tex., for defendants-appellants.

Bruce Hallmark, Ruth Kern, Bruce J. Ponder, El Paso, Tex., for Richard B. Smith.

Hector Salvida Amaya, pro se.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

This is an appeal from an order of the United States District Court for the Western District of Texas requiring the sheriff and the members of the commissioners court of El Paso County, Texas, to limit the inmate population of the El Paso County jail and to submit weekly reports of conditions at the jail to the district court.

This is not the first time that this controversy has been before this Court. The case began on July 3, 1974, when an inmate of the jail, acting on his own behalf and as a representative of all other El Paso County jail inmates, filed suit for injunctive relief under 42 U.S.C. § 1983 alleging that conditions at the jail violated the United States Constitution and Texas statutory law. On September 25, 1975, after a nonjury trial, the district court found these allegations to be true.[1] It issued an order requiring the sheriff and the commissioners court to initiate certain remedial programs by January 20, 1976,[2] to bring the jail into compliance with Tex.Rev.Civ.Stat.Ann. art. 5115 by

---

1. The district court's findings of fact and conclusions of law are set out in Appendix # 1.

2. The district court ordered the initiation of:

   1. An *exercise and recreation program* under which (a) each prisoner is taken into sunlight and fresh air at least once each day, and (b) each prisoner is given an opportunity to engage in physical exercise and recreation at least once each day.

   2. An *education and rehabilitation program* under which all prisoners shall (a) be provided with adequate reading material, (b) be afforded frequent and regular opportunities for legal, religious or personal counseling, (c) be provided free access, during daylight hours, to an area other than his bunk, (d) each prisoner who is certain or likely to be a prisoner for more than sixty days shall be given a choice among several vocational training courses, and (e) shall be afforded an opportunity to attend religious services on a regularly scheduled basis.

   3. A *medical program* under which (a) each incoming prisoner is given a medical examination within 36 hours after arrival, (b) prisoners who are sick or injured from whatever cause are given a medical examination by a licensed physician immediately after the sickness or injury is reported, and (c) physician-prescribed medications are provided to inmates as ordered by the physician.

   4. A *food service program* under which (a) meals served to prisoners are served hot, (b) at least one fresh green vegetable, one fresh yellow vegetable, and one serving of meat, or protein-provided meat substitute, is served to each prisoner each day, and (c) adequate clean utensils and serving vessels are provided for each prisoner.

   5. A *supply and facilities program* under which (a) clean towels and toilet paper are never unavailable to prisoners, (b) a clean blanket, clean mattress cover, mattress and bunk are never unavailable to each prison-

   er, (c) no toilet, urinal, shower, washbowl or other plumbing facility is ever out of order for more than 24 hours, (d) adequate hot and cold water is available, (e) supplies necessary for prisoners to maintain themselves in sanitary condition are always available, and (f) one toilet, one shower bath, and one combined lavatory and drinking fountain are provided for each twelve prisoners or fraction thereof confined in any area.

   6. A *jail personnel, safety and supervision program* under which (a) every area holding prisoners is visited each hour of the 24-hour day, (b) a communications system whereby any prisoner may call for help from a guard at any time and receive the same within a few minutes, (c) each floor of the jail shall have at least one non-prisoner guard available at all times, and (d) jail personnel are paid on the same scale as patrol personnel of the Sheriff's Department.

   7. A *ventilation and lighting program* under which (a) temperatures within prisoner enclosures are within the temperature range of 65°F. to 85°F., and (b) the lighting in areas available to prisoners is, during daylight hours, adequate for reading purposes.

   8. A *separation of prisoner program* under which (a) those under 18 years of age are always separated from others, (b) witnesses are always separated from others, (c) males are always separated from females, (d) first offenders awaiting trial are always separated from all classifications of convicted prisoners, and (e) prisoners with communicable or contagious diseases are always separated from all others.

   9. A *disciplinary program* under which (a) jail rules and regulations, as well as prisoners' rights with respect to violations, are effectively made known to all prisoners and (b) disciplinary procedures shall comply in all respects with *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

September 1, 1977,[3] and to provide an outdoor area for exercise and a rehabilitative program of recreation by September 1, 1977. With certain modifications irrelevant here, the district court order was affirmed on appeal.[4] On June 15, 1977, on remand, the district court ordered the defendants to

3. Article 5115 is set out in full in Appendix # 2.

4. The Court modified the sections of the original order relating to exercise and recreation, diet, medical care, jail safety and supervision, ventilation, and discipline. The rest of the order was affirmed without discussion. *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977).

5. The order, as modified November 28, 1977, provides:

### ORDER

The Judgment of this Court, heretofore entered on September 25, 1975, enjoined the Commissioners Court of El Paso County, Texas and Mike Sullivan, Sheriff of El Paso County, Texas, from further violating the provisions of Article 5115, V.A.T.S., after September 1, 1977.

Subsequent to the receipt of the published opinion of the United States Court of Appeals for the Fifth Circuit on May 19, 1977, this Court, on June 15, 1977, ordered the Defendants to submit various reports and plans for the Court's consideration. This report was filed on August 31, 1977 in a bifurcated form, some parts being signed by some of the Defendants and some parts being signed by others.

It is neither the intention or the responsibility of this Court to solve the problems that beset the Sheriff and the Commissioners Court of El Paso County in the operation of the El Paso County Jail; nor does the Court intend to supervise those elected officials whose responsibility it is to administer the day to day operation of that institution.

The Texas Legislature, by enactment of Tex.Rev.Civ.Stat.Ann., art. 5115 (hereinafter "Article 5115"), prescribed that the responsibility for providing safe and suitable jails and the responsibility for their proper operation fall upon the Commissioners Court.

Accordingly, IT IS ORDERED:

(1) That by no later than 5:00 o'clock P.M. on December 7, 1977, the Commissioners Court of El Paso County, Texas and Mike Sullivan, Sheriff of El Paso County, Texas, shall cause the inmate population of the El Paso County Jail to be reduced to no more than 500 total inmates;

(2) That by no later than 5:00 o'clock P.M. on December 7, 1978, the Commissioners Court of El Paso County, Texas and Mike Sullivan, Sheriff of El Paso County, Texas

submit reports on their present compliance and their plans for future compliance with the court's order as modified on appeal. After receiving these reports and denying a request for a hearing, the district court, on October 19, 1977, issued the order that is the subject of this appeal.[5]

shall cause the inmate population of the El Paso County Jail to be reduced in such a fashion, manner, and extent that the Jail will be operated in compliance with Article 5115, and with the Rules and Procedures promulgated by the Texas Commission on Jail Standards in compliance with Article 5115.1.

(3) That by no later than 5:00 o'clock P.M. on Tuesday, January 3, 1978, and by 5:00 o'clock P.M. on each and every Tuesday thereafter until otherwise ordered by this Court, the persons hereinafter set out in Subparagraph A, or their duly elected or properly appointed successors in office, shall file in the Office of the United States District Clerk at the United States Courthouse in El Paso, Texas, a document certifying the information set forth in Paragraph B below.

A. The document shall be sworn to and subscribed by:

1. The County Judge of El Paso County, the Honorable T. Udell Moore.

2. The Commissioners of El Paso County, Clyde Anderson, Richard Telles, Rogelio Sanchez and Charles Mattox.

3. The Sheriff of El Paso County, Mike Sullivan.

B. The filed document will certify whether:

1. Each inmate of the El Paso County Jail has been allowed one hour of supervised physical exercise or recreation on at least three days in the immediately preceding seven days and each inmate who has been confined longer than thirty days has been allowed access to sunlight for one hour in the immediately preceding seven (7) days.

2. Each prisoner has (a) been provided with adequate reading material, (b) been afforded regular opportunities for legal, religious and personal counseling, (c) been provided free access, during daylight hours, to an area other than his bunk, (d) been given a choice among several vocational training courses if he has been a prisoner for more than sixty (60) days, and (e) been afforded an opportunity to attend religious services on a regularly scheduled basis.

3. All inmates who are sick or injured from whatever cause are given a medical examination by a licensed physician immediately after the sickness or injury is reported, and that physician-prescribed medications are provided to inmates as ordered by the physician.

■ The defendants claim that this order is invalid in four respects. First, they contend that the nature of the relief that the order requires cannot legally be provided by the defendants under state law. They argue that compliance with the order's limitation on inmate population would require the sheriff to violate his statutory duty to accept prisoners [6] and the commissioners court to violate its duty to stay within spending limits imposed by state law.[7] This claim has no merit. It is well established that

4. Each inmate has received daily, well-balanced meals containing sufficient daily nutritional value to preserve health, and that such meals are served hot.

5. (a) clean towels and toilet paper are always available to prisoners, (b) a clean blanket, clean mattress cover, mattresses and bunks are always available to each prisoner, (c) all toilets, urinals, showers, wash bowls and other plumbing facilities have been operative, without being out of order for more than 24 hours, (d) adequate hot and cold water is available, (e) supplies necessary for prisoners to maintain themselves in sanitary condition are always available, and (f) one toilet, one shower-bath and one combined lavatory and drinking fountain are provided for each twelve prisoners or fraction thereof confined in any area.

6. (a) every area holding prisoners is visited each hour of the 24-hour day, (b) a communications system is in operation whereby any prisoner may call for help from a guard at any time and receive help within a few minutes, (c) each floor of the Jail has had at least one prisoner-guard available at all times.

7. (a) those inmates under 18 years of age are always separated from others, (b) witnesses are always kept separate from others, (c) male inmates are separated from female inmates, (d) first offender inmates awaiting trial are always separated from all other classifications of convicted prisoners, and (e) inmates with communicable or contagious diseases are always separated from all others.

8. (a) jail rules and regulations, as well as prisoners' rights with respect to violations, are effectively made known to all prisoners and (b) disciplinary procedures comply in all respects with *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The report shall state the high and low temperatures recorded during each 24-hour period in a designated representative area containing inmates on every floor on which inmates are kept. Such report shall be for each 24-hour period in the immediately preceding seven consecutive days.

For each instance in which the subscribers of the report are unable to certify the implementation of the matters addressed by Paragraphs "B(1)" through "B(8)" above, the report shall state in which particulars the conditions at the jail have deviated, during the preceding seven (7) days, from the standards prescribed by this Court in Paragraphs "B(1)" through "B(8)".

A copy of the weekly report shall be forwarded, immediately upon receipt by the United States District Clerk, to the Chairman of the Commission on Jail Standards.

In compliance with the Opinion rendered by the United States Court of Appeals for the Fifth Circuit in this cause, the portion of this Court's Order of September 25, 1975 requiring the Commissioners Court of El Paso County, Texas to provide an outdoor area for exercise is amended to extend the compliance date to September 1, 1978.

The Defendants herein have failed to comply with the Order of September 25, 1977 to provide "a rehabilitative program of recreation"; however, because of the involvement of the Defendants in appealing the original Judgment of this Court and in other planning, the time for providing a rehabilitative program of recreation is extended to September 1, 1978.

Nothing contained in this Order shall diminish the responsibility of the County Judge of El Paso County, Texas, the County Commissioners of El Paso County, Texas, the Sheriff of El Paso County, Texas or the Jailers of El Paso County, Texas to comply with Tex.Rev.Civ.Stat.Ann. Art. 5117.

The rate charged by El Paso County for the housing of Federal prisoners shall not be increased without first obtaining the consent of this Court unless such increase, if any, is agreed upon by the Federal Bureau of Prisons of the Department of Justice.

All costs heretofore adjudged against Defendants which have not been paid will be paid within ten (10) days from the date of this Order.

A copy of this Order shall immediately be forwarded by the Clerk of the Court to the Chairman of the Commission on Jail Standards.

6. Tex.Rev.Civ.Stat.Ann. art. 5116, on which the defendants rely, provides in part that "[e]ach sheriff is the keeper of the jail of his county. He shall safely keep therein all prisoners committed thereto by lawful authority . . . ."

7. The defendants also argue that the order requires the members of the commissioners court to swear to weekly reports relating to matters over which they have no power or authority to have actual knowledge. The district court's January 6, 1978, modification of the order so as to require only that the defendants submit the reports on best information and belief effectively moots this argument.

inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement, *e. g., Williams v. Edwards,* 547 F.2d 1206, 1212–13 (5th Cir. 1977); *Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Mickens v. Winston,* 462 F.Supp. 910, 912 (E.D.Va.1978); *Inmates of Boys' Training School v. Southworth,* 76 F.R.D. 115, 119 (D.R.I.1977); nor will an allegedly contrary duty at state law, *Costello v. Wainwright,* 525 F.2d 1239, 1243 (5th Cir.), *vacated and replaced,* 539 F.2d 547 (5th Cir. 1976) (en banc), *replacement rev'd and remanded,* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977), *original opinion reinstated,* 553 F.2d 506 (5th Cir. 1977) (en banc).

▉▉▉ The defendants' second and third claims also fail. Their assertion that the portion of the district court order requiring the submission of weekly reports violates principles of federalism is frivolous, as is their contention that the district court lacked jurisdiction to order the defendants to continue to accept federal prisoners in the manner prescribed by state law.[8]

▉▉ The defendants are correct, however, in arguing that the trial court erred in failing to conduct further hearings as to the overall conditions at the jail before ordering that the inmate population be limited to 500.

▉▉ It need not be repeated that federal courts should intervene in the day-to-day operation of state and local penal and detention systems only with the greatest of reluctance. *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Williams v. Edwards,* 547 F.2d at

1211–12; *Pugh v. Locke,* 406 F.Supp. 318, 328 (M.D.Ala.1976), *aff'd in part sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *modified sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Diamond v. Thompson,* 364 F.Supp. 659, 662 (M.D.Ala.1973), *aff'd,* 523 F.2d 1201 (5th Cir. 1975). Where constitutional deprivations are established, either in specific instances, *e. g., Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (regulation infringing inmates' right of access to the courts), or by the totality of conditions within an institution, *e. g., Gates v. Collier,* 501 F.2d at 1309 ("[e]ach factor separately . . . may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment"), the federal courts may, and must, if the issue is appropriately presented, intervene. *E. g., Hutto v. Finney,* 437 U.S. 678, 685–88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. 1800. *See also Newman v. Alabama, supra; Pugh v. Locke, supra.* As indicated above, the federal courts have the power, and the duty, to make their intervention effective. To prevent further constitutional deprivations, a court may order forms of relief not normally required by the Constitution but nevertheless necessary given the circumstances if the court's efforts are to be successful. *See, e. g., Hutto v. Finney,* 437 U.S. at 685–88, 98 S.Ct. 2565 (affirming order forbidding more than 30 days of punitive isolation); *Miller v. Carson,* 563 F.2d 741, 751 (5th Cir. 1977) (affirming order requiring outdoor exercise).[9] Where, how-

8. The district court in its order stated that nothing in the order was to diminish the responsibility of the defendants to comply with the requirement of Tex.Rev.Civ.Stat.Ann. art. 5117 that "[s]heriffs and jailers shall receive into their jails such prisoners as may be delivered or tendered to them by any United States Marshal or his deputy for any district of Texas . . . ." In addition, the court required the defendants to obtain prior approval from the court of any contested increase in the fee charged by the county for this service.

The defendants' argument is that, even assuming the validity of the rest of the court's

order, this portion is invalid because at the time it was entered the United States was not a party to the litigation.

9. In *Hutto v. Finney,* the majority indicated that solitary confinement for a period in excess of thirty days is not necessarily cruel and unusual punishment, and noted that if the state "had fully complied with the court's earlier orders, the present time limit might well have been unnecessary," but it concluded that "taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure

ever, no constitutional deprivation is established, the justification for federal judicial intervention evaporates. Although state standards may sometimes serve as a useful guide in a federal court's determination and redress of constitutional deprivations, *see, e. g., Williams v. Edwards,* 547 F.2d at 1214 (state fire and sanitation codes indicate 'evolving notions of decency'; use of such codes allows federal district judge to minimize intrusion into details of state prison administration), *Adams v. Mathis,* 458 F.Supp. 302, 309 (M.D.Ala.1978), a violation of state law, without more, will not justify federal judicial intervention. *Hutto v. Finney,* 437 U.S. at 688, 98 S.Ct. 2565 & n.12; *Diamond v. Thompson,* 364 F.Supp. at 662. *Cf. Taylor v. Sterrett,* 600 F.2d 1135 (5th Cir. 1979) (requiring district court that had intervened on basis of state law violation to discontinue exercise of its jurisdiction and dismiss the cause). Unless acting to reme-

dy federal constitutional violations as part of a "totality" approach, federal judges are not to become enmeshed in the minutiae of prison operations.

From the record before us, we find it impossible to determine whether the district court's 500-inmate limitation on the jail population was tailored to remedy a constitutional violation. Although unconstitutional overcrowding was alleged in the original complaint, the district court never responded to the allegation with recorded findings of fact or conclusions of law. What the record indicates is that the court ordered the 500-inmate limit merely to bring the jail closer to compliance with state law.[10] As stated above, the imposition of such an order by a federal court is inappropriate.[11] A limitation on the inmate population of the El Paso County jail may be necessary, but the district court should impose such a limitation only if the court

against the risk of inadequate compliance." 437 U.S. at 687, 98 S.Ct. at 2572 (footnote omitted). In addition to finding that the order presented little danger of interference with prison administration, and that it was issued by a trial judge who had had long experience with the litigation, the majority noted that "[t]he order is supported by the interdependence of the conditions producing the violation." It stated that "[t]he 30-day limit will help to correct these conditions." *Id.* at 688, 98 S.Ct. at 2572 (footnote omitted). *Cf. id.* at 714, 98 S.Ct. 2565, 2572 (Rehnquist, J., dissenting) (accusing the majority of allowing the district court to assume a management role in the Arkansas prison system).

In *Miller,* the court stated that "[w]hen the totality of conditions in a penal institution violates the Constitution, the trial court's remedies are not limited to the redress of specific constitutional rights." 563 F.2d at 751.

10. Tex.Rev.Civ.Stat.Ann. art. 5115 requires, among other things, *see* Appendix # 2, that not less than thirty percent of a jail's total designated capacity be accommodated in single-prisoner cells. The El Paso County jail, which had an alleged designated capacity of 588 inmates but only 14 single cells, clearly failed to meet this requirement. It was apparently to bring the jail closer to compliance with Article 5115 that the district court ordered the 500-inmate limit. As the court remarked during a March 9, 1978, contempt proceeding:

I think if we accept that the [defendants] will do nothing concerning the enlargement of the jail or the restructuring of the jail, that you

will, in fact, continue to face a problem concerning how many people you can handle, Mr. Rodriguez.

That was the reason for the Court's originally reducing the amount of 500 because you were so utterly and completely out of compliance with both the spirit and the fact of 5115 that there is no possible way exceeding 500 that you can begin to comply with the proper segregation.

11. It would seem especially inappropriate where the state has indicated *and demonstrated* a willingness to police itself. In *Taylor v. Sterrett,* 600 F.2d 1135, 1141–45 (5th Cir. 1979), we noted that in 1975 the state of Texas created a Commission on Jail Standards charged with supervising day-to-day administration and long-term planning in Texas county jails. We also noted that the Commission is authorized to close nonconforming facilities. Tex.Rev.Civ. Stat.Ann. art. 5115.1. We concluded that the establishment of the Commission indicated a strong state commitment to improve conditions in Texas county jails. 600 F.2d at 1145–46 (conclusion held to warrant return of Dallas County jails to state and local jurisdiction). The record in this case does not suggest that that conclusion was mistaken. As the district judge stated in a conference of counsel held approximately a week after the issuance of the order: "If I had a sneaking suspicion or some firm evidence that they [the Commission on Jail Standards] weren't going to perform, then I would have no hesitance to find that—a sham and a pretense and—but I don't think that."

finds on remand, after a hearing and evaluation of evidence relating to *the totality of conditions* at the jail as they now exist, that the jail is overcrowded and that, considered with all of the other existing conditions, incarceration therein is violative of the prisoners' constitutional rights.[12]

Although unchallenged by the defendants here, there are other aspects of the district court's operative orders in this case that may, for the reasons set out above, constitute unwarranted federal judicial intervention in the day-to-day operation of the El Paso County jail. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (setting out test for determining constitutionality of conditions of confinement in facilities housing pretrial detainees). The district court is instructed on remand to review its orders in light of *Wolfish* and the totality of the conditions at the jail as they now exist. The court should continue to exercise its jurisdiction only if and to the extent that it determines that there are continuing deprivations of federal constitutional dimensions. *See Hutto v. Finney,* 437 U.S. at 688, 98 S.Ct. 2565 & n.12; *Taylor v. Sterrett,* 600 F.2d at 1145–46.

For the above reasons, the portion of the district court order limiting the inmate population at the El Paso County jail is vacated. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

### APPENDIX # 1

### FINDINGS OF FACT

1. *EXERCISE AND RECREATION :*
   A. There is no program for exercise and recreation in the jail.
   B. Prisoners are confined to their cells for the duration of their sentences or until trial.
   C. Prisoners have no exposure either to sunlight or to fresh air.

2. *EDUCATION AND REHABILITATION :*
   A. The only organized program of education provided at the jail is the Cooks and Bakers School.
   B. Ample reading material is available but not distributed to prisoners at scheduled intervals.
   C. Prisoners do not have frequent or regular opportunities for legal, religious or personal counseling.
   D. No regularly scheduled religious services are provided for the inmates.

3. *MEDICAL CARE :*
   A. Incoming prisoners are not given medical examinations.
   B. Physician-prescribed medications are many times not being provided to inmates as ordered by the physician.

4. *FOOD AND DIET :*
   A. Inmates of the jail are not now brought to a dining area for each meal.
   B. Meals are served to the inmates in their cells.
   C. Many times meals received by the inmates are not hot.
   D. Many times adequate eating utensils are not provided for inmates.

5. *SUPPLIES AND FACILITIES :*
   A. On many occasions towels and toilet paper are not available to prisoners.
   B. On occasion prisoners are not supplied with clean blankets, mattresses or bunks.
   C. On occasion plumbing facilities are left stopped up for extended periods of time.

12. If the district court makes such a determination and documents the conclusion with appropriate findings, the court should take care to establish a sufficient evidentiary basis for any inmate population limit that it decides to order as a result. In addition, it should reevaluate its assessment of the importance of holding the defendants to their *state statutory obligation* to continue to accept federal prisoners. *See* note 8, *supra.*

D. On occasion no hot water is available in the showers.

E. On many occasions inmates are not given the cleaning supplies necessary to maintain their cells in a sanitary condition.

6. *JAIL PERSONNEL, SAFETY AND SUPERVISION:*

A. Inmates, on numerous occasions, have been subjected to beatings by fellow prisoners.

B. Inmates, on occasion, have been subjected to homosexual attacks by fellow prisoners.

C. Many times jail personnel are completely absent from certain floors of the jail for extended periods of time.

D. On many occasions hours will pass without a cell area being visited by jail personnel.

7. *VENTILATION AND LIGHTING:*

A. On numerous occasions prisoners are subjected to temperatures not within the range of 65°F. to 85°F.

B. The lighting in the area available to prisoners, during daylight hours, is many times not adequate for reading.

8. *SEPARATION OF PRISONERS:*

A. On occasion inmates under age 18 are not separated from inmates over age 18.

B. On occasion material witnesses are not separated from other inmates.

C. On occasion first offenders awaiting trial are not separated from other classifications of convicted prisoners.

D. Inmates with communicable diseases are not always separated from other inmates.

9. *DISCIPLINARY PROGRAM:*

A. Jail rules, standards and prisoner rights are not communicated in such a fashion to inmates to insure their awareness of the same.

B. There is no established and published system for hearings for prisoners charged with infractions of the rules or standards of the jail.

10. *PHYSICAL LAY–OUT:*

A. The El Paso County Jail does not provide individual one-man or one-woman cells to accommodate not less than 30% of the total designated prisoner capacity of the jail, as required by Art. 5115, V.A.T.S.

B. The El Paso County Jail provides dormitory space to accommodate more than 40% of the total designated prisoner capacity of the jail in violation of Art. 5115, V.A.T.S.

C. The El Paso County Jail does not provide cells, compartments or dormitories for sleeping purposes, designed to accommodate three or more prisoners, which are accessible to a separate dayroom to which prisoners may be given access during the day, as required by Art. 5115, V.A.T.S.

D. The cells, compartments and dormitories designed for three or more prisoners are not provided with one water closet and one combination lavatory and drinking fountain for each twelve prisoners or fraction thereof to be confined therein, as required by Art. 5115, V.A.T.S.

E. In the El Paso County Jail areas used as dayrooms for the confinement of three or more prisoners are not provided with one water closet, one combination lavatory and drinking fountain, and one shower bath for each twelve prisoners or fraction thereof to be confined therein, as required by Art. 5115, V.A.T.S.

F. In the El Paso County Jail the areas used as dayrooms are furnished only with tables, some with benches and some without, and no chairs, as required by Art. 5115, V.A.T.S.

G. The El Paso County Jail does not provide for temporary holding of each person suspected of insanity or who has been legally adjudged in-

sane, a special enclosure or room not less than 40 sq. ft. and having a ceiling height of not less than 8 ft. above the floor, with a floor and wall of such enclosure provided with a soft covering designed to protect a violent person, and a hammock not less than 2 ft. 3 in. wide and 6 ft. 3 in. long, made of elastic or fibrous material, as required by Art. 5115, V.A.T.S.

11. *PRESENTLY EXISTING FINANCIAL RESOURCES:*

A. That 18 United States Code § 4002 provides that the Director of the Bureau of Prisons may contract with the authorities of any state, territory or political subdivision for the imprisonment, subsistence, care and proper employment of federal prisoners, and that the rates to be paid by the federal government to such a political subdivision ". . . may be such as will permit and encourage the proper authorities to provide reasonably decent, sanitary, and healthful quarters and subsistence for such persons."

B. That such a contract exists between the Director of the Bureau of Prisons and the County of El Paso and that thereunder the federal government pays $7.00 per day ($9.00 per day on Oct. 1, 1975) for each federal prisoner housed in El Paso County Jail, which totals approximately $300,000.00 a year.

C. That of each such $7.00 amount, $1.25 ($1.50 of the $9.00 amount on Oct. 1, 1975) is put into the "Jail Improvement Fund", and that the balance goes into the El Paso County General Fund.

D. That the financial budget for the jail is determined by the El Paso County Commissioners and is allocated out of the County General Fund.

E. That the entire budget for the jail is approximately $350,000.00 to $400,-000.00 per year.

F. That the El Paso County Commissioners may allocate such portion of the County General Fund as they deem proper for the operation of the El Paso County Jail.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties to this action by virtue of 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 42 U.S.C. § 1983.

2. This cause is properly maintainable as a class action under Rule 23(b)(2), Federal Rules of Civil Procedure.

3. Plaintiffs, inmates of the El Paso County Jail, have been deprived of rights assured them and protected by the 1st, 8th, and 14th Amendments to the Constitution of the United States and 42 U.S.C. § 1983 due to (a) the overall conditions of the El Paso County Jail, and (b) a combination of practices imposed upon them by Sheriff Mike Sullivan.

4. The existing facilities and practices maintained by Defendants are not in compliance with the minimum requirements established by Art. 5115, V.A.T.S.

## APPENDIX # 2

Art. 5115. Jails provided

The Commissioners Court shall provide safe and suitable jails for their respective counties, and shall cause the same to be maintained in good sanitary condition at all times, properly ventilated, heated and lighted; structurally sound, fire resistant and kept in good repair. Furthermore, they shall cause the jails in their respective counties to be kept in a clean and healthy condition, provided with water of safe quality and ample quantity and sewer disposal facilities in accordance with good sanitary standards, and provided with clean, comfortable mattresses and blankets, sufficient for the comfort of the prisoners, and that food is prepared and served in a palatable and sanitary manner and according to good dietary practices and of a quality to maintain good health. Such jails shall comply

with the provisions of this Act and with the rules and procedures of the Commission on Jail Standards.[1]

## SUITABLE SEGREGATION

The term "safe and suitable jails," as used in this Act, shall be construed to mean jails which provide adequate segregation facilities by having separate enclosures, formed by solid masonry or solid metal walls, or solid walls of other comparable material, separating witnesses from all classifications of prisoners; and males from females; and juveniles from adults; and first offenders, awaiting trial, from all classifications of convicted prisoners; and prisoners with communicable or contagious diseases from all other classifications of prisoners. Furthermore, the term "safe and suitable" jails shall be construed to mean jails either now or hereafter constructed, except that, in lieu of maintaining its own jail, any county whose population is not large enough to justify building a new jail or remodeling its old jail shall be exempt from the provisions of this Act by contracting with the nearest available county whose jail meets the requirements set forth in this Act for the incarceration of its prisoners at a daily per capita rate equal to the cost of maintaining prisoners in said jail, or at a daily rate mutually agreed to by the contracting counties.

No person suspected of insanity, or who has been legally adjudged insane, shall be housed or held in a jail, except that such a person who demonstrates homicidal tendencies, and who must be restrained from committing acts of violence against other persons, may be held in a jail for a period of time not to exceed a total of twenty-four (24) hours, during which period he shall be kept under observation continuously. At the end of the twenty-four (24) hour period, such person shall be released or taken to a hospital or mental hospital. Furthermore, for such temporary holding of each person suspected of insanity, or who has been legally adjudged insane, there shall be provided a special enclosure or room, not less than forty (40) square feet and having a ceiling height of not less than eight (8) feet above the floor. Furthermore, the floor and the walls of such enclosure shall be provided with a soft covering designed to protect a violent person, temporarily held therein, from self-injury or destruction. One hammock, not less than two (2) feet, three (3) inches wide and six (6) feet, three (3) inches long, made of elastic or fibrous material shall be provided in each such special enclosure.

## SUITABLE SECURITY AND SAFETY

For the purpose of this Act, the term "safe and suitable jails" is further defined to mean jails which provide adequate security and safety facilities by having separate cells or compartments, dormitories, and day rooms, of varying dimensions and capacities for prisoners confined therein, except that, if practicable, no one such cell or compartment shall be designed for confining two (2) prisoners only. Cells or compartments shall be designed to accommodate from one (1) to eight (8) prisoners each, and furthermore, such dormitories and day rooms shall be designed to accommodate not more than twenty-four (24) prisoners each. Furthermore, in each such jail there shall be provided individual one-man or one-woman cells to accommodate not less than thirty per cent (30%) of the total designated prisoner capacity of the jail and dormitory-type space may be provided to accommodate not more than forty per cent (40%) of the total designated prisoner capacity of the jail. All cells, compartments and dormitories for sleeping purposes, where each such cell, compartment or dormitory is designed to accommodate three (3) or more prisoners, shall be accessible to a day room to which prisoners may be given access during the day. Cells for one (1) prisoner only shall have a minimum floor area of forty (40) square feet and all other cells, compartments, dormitories and day rooms (including safety vestibule area) shall have a minimum floor area equal to eighteen (18) square feet for each prisoner to be confined therein. The ceiling height above finished floor shall be not less than eight (8) feet for any cell, compartment, dormitory or day room where prisoners are confined.

**1050**

The term "safe and suitable jails," as used in this Act, is further defined to mean that, for reasons of safety to officers and security, the entrance and/or exit to each group of enclosures forming a cell block or group of cells and/or compartments used for the confinement of three (3) or more prisoners shall be through a safety vestibule having one (1) or more interior doors in addition to the main outside entrance door to such cell block, all arranged to be locked, unlocked, opened or closed by control means located outside of any such enclosure or cell block.

### SUITABLE SANITATION AND HEALTH

The term "safe and suitable jails" is further defined to mean jails which provide adequate facilities for maintaining proper standards in sanitation and health. Each cell designed for one (1) prisoner only shall be provided with a water closet and a combination of lavatory and drinking fountain, table and seat. Each cell, compartment or dormitory designed for three (3) or more prisoners, shall be provided with one (1) water closet and one (1) combination lavatory and drinking fountain for each twelve (12) prisoners or fraction thereof to be confined therein. Furthermore, all such cells, compartments and dormitories shall be provided with one (1) bunk, not less in size than two (2) feet, three (3) inches wide and six (6) feet, three (3) inches long, for each prisoner to be confined therein. Furthermore, each day room for the confinement of three (3) or more prisoners shall be provided with one (1) water closet, one (1) combination lavatory and drinking fountain and one (1) shower bath for each twelve (12) prisoners, or fraction thereof, to be confined therein. Furthermore, each day room shall be otherwise suitably furnished.

The provision of this Act, as amended, shall become applicable to all jails upon its effective date. The standards prescribed by this Act are minimum standards only. The provisions of this Act are enforceable by the Commission on Jail Standards.[1]